UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 09-3472(DSD/JJG)

Austin H. Coleman II,

       Plaintiff,

v.                                                    **ORDER**

Oracle USA, Inc.,

       Defendant.


    James H. Kaster, Esq., Katherine M. Vander Pol, Esq.,
Matthew H. Morgan, Esq. and Nichols Kaster, PLLP, 80
South Eighth Street, Suite 4600, Minneapolis, MN 55402,
counsel for plaintiff.

    Daniel Oberdorfer, Esq., Amy B. Conway, Esq. and Leonard,
Street & Deinard, 150 South Fifth Street, Suite 2300,
Minneapolis, MN 55402, counsel for defendant.


    This matter is before the court upon the motions to exclude
expert opinions and for summary judgment by defendant Oracle USA,
Inc. (Oracle).[1]  Based on a review of the file, record and
proceedings herein, the court grants the motion to exclude expert
opinions and grants in part the motion for summary judgment.


## BACKGROUND

    This employment dispute arises out of the termination of
plaintiff Austin H. Coleman II by Oracle on January 5, 2009.
Oracle sells computer software. Compl. ¶ 7.  Coleman began working
at Oracle in 1999 as a business development manager.  Id. ¶ 8.

---

[1] Oracle USA, Inc. is now Oracle America, Inc.

From February 2003 until his termination, Coleman worked as an application sales manager (ASM).  Regional Manager Tony Huff was Coleman's direct supervisor.  Id. ¶ 11.  From fiscal year 2007 through Coleman's termination, Huff reported to Regional Vice President Ted Stuart.  Id. ¶ 11.  In fiscal years 2008 and 2009, three Regional Managers, including Huff, and forty ASMs, including Coleman, reported to Stuart.  Stuart Dep. 8; Morgan Aff. Ex. 27.

Coleman's primary duty was to sell software.  Compl. ¶ 9; Stuart Dep. 72.  Oracle assigns each ASM a sales territory, or sales patch, comprised of companies from which the ASM can solicit sales.  Compl. ¶ 12.  A "net new" territory or account refers to a company that does not own any Oracle applications.  Coleman Dep. 26.  An "install" territory or account refers to a company that already owns an Oracle application.  Id.  Oracle also assigns each ASM a sales quota.  Oracle provides resources to help ASMs reach their sales quotas, including allowing ASMs to work with sales consultants.  Id. at 60-61.  Sales consultants cost Oracle approximately $250 per hour.  Tate Dep. 63.

In fiscal year 2004, Coleman achieved 149% of his sales quota and Huff gave Coleman the highest possible "Composite Performance Rating" of five for "exceptional performance."  Morgan Aff. Ex. 17. In fiscal year 2005, Coleman again made his sales quota; Huff gave Coleman an "Overall Rating" of "5-Outstanding" and commented that Coleman "is an asset to our organization."  Id. Ex. 18.

2

In April 2006, Huff and Craig Tate[2] met with Human Resources Manager Siobhan Donnelly because they were concerned that Coleman was unlikely to meet his quota for fiscal year 2006.  See Donnelly Dep. 49.  Huff and Tate wanted to place Coleman on a performance improvement plan (PIP).  Donnelly believed that a PIP was not warranted and instead recommended that they place Coleman on a performance expectation plan (PEP).  See id. at 51-53.  Oracle uses a PEP when an ASM first exhibits performance problems; a PEP does not include language regarding termination.  See id. at 30-31, 51-53.  On April 19, 2006, Huff placed Coleman on a PEP that identified several "problem areas" and five specific goals for performance improvement.  See Oberdorfer Aff. Ex. G.  Coleman met two of the five stated goals before the end of the fiscal year.  See Coleman Dep. 36.  In the fiscal year 2006 review, Huff gave Coleman an "Overall Rating" of "2-Needs improvement/new to job."  Morgan Aff. Ex. 22.  Huff commented that "[Coleman] is solid in almost every respect .... [C]onsistency needs to be [Coleman's] strength for FY 07."  Id.

In fiscal year 2007, Coleman again failed to meet his quota.  In the fiscal year 2007 review, Huff gave Coleman an "Overall Rating" of "3-Successfully meets expectations."  Id. Ex. 23.  Huff commented that "[Coleman] had a very solid [fourth quarter], he had

---

[2] In fiscal year 2006, Tate was the Regional Vice President overseeing Huff's team.  See Donnelly Dep. 41.

several deals in play which had they closed rather than slipped he [would] have made his quota." Id. at 000342.

During fiscal year 2008, Stuart worked closely with Huff's team, including Coleman, because Huff was ill.[3] Stuart Dep. 16-17. Coleman surpassed his sales quota in fiscal year 2008. Morgan Aff. Ex. 40. As a result, Oracle sent Coleman and his wife to "Club Excellence" (Club) in the Canadian Rockies in late June 2008. Compl. ¶ 15. ASMs attend Club Excellence on an "invitation basis and minimum criteria includes 110% attainment or greater." Morgan Aff. Ex. 28. Huff, however, gave Coleman an "Overall Rating" of "2-Needs Improvement/new to the job" in the fiscal year 2008 review. Id. Ex. 30. Coleman received "2-Development needed" in the areas of Strategic Thinking, Customer Focus, Organizational Awareness, Account Management, Competitive Awareness and Sales Process Acumen. See id. Coleman received "1-Does not meet expectations" in the area of Communication, Influencing and Negotiating, Results Orientation, Teamwork, Objection Handling and Opportunity Management. See id. Huff commented that "[Coleman] made his number in FY08. But it came at a high cost in terms of resources invested and return on those hours." Id.

According to Coleman, the comments in the evaluation were exaggerated and did not "reflect a full account of the facts." Id.

---

[3] Huff died in June 2010, before he could be deposed in this case. See Def.'s Mem. Supp. 3 n.3.

First, Coleman notes that Huff and Lisa Schagunn, a regional sales consulting lead, approved and authorized all of Coleman's requests for sales consultants. <u>See</u> Stuart Dep. 44-45; Coleman Dep. 72-73. Schagunn and Huff did not limit Coleman's support hours or inform Coleman that he was using too many sales consultant hours. <u>See</u> Stuart Dep. 46, 49. Second, Coleman used company resources because his deals were large and complex. <u>See</u> Coleman Dep. 74. Coleman's seven major accounts in fiscal year 2008 were net new accounts which tend to be more resource-intensive than install accounts. <u>See</u> Morgan Aff. Ex. 30, at 000343; Stuart Dep. 44. Third, Stuart was directly involved in several of Coleman's fiscal year 2008 deals, <u>see</u> Morgan Aff. Exs. 31-33, but never told Coleman that he was using too many resources. Coleman believed that the feedback in the appraisal review was inconsistent with his performance in fiscal year 2008 because he exceeded his quota and was invited to Club.

In fiscal year 2009, Oracle changed Coleman's sales patch from primarily net new accounts to exclusively install accounts. Coleman Dep. 27, 145-46. Coleman's new sales patch was "completely different" and had half as many accounts. Stuart Dep. 106. Coleman's sales quota simultaneously increased by $600,000.[4] Tate Dep. 91. Stuart claims that he changed Coleman's sales patch

---

[4] Install ASMs tended to carry a slightly higher quota in fiscal year 2009 because Oracle gets more business out of its install territories. Tate Dep. 145.

because Oracle was shifting to a different model for sales and because Coleman's skill set was better suited to an install patch. Stuart Dep. 106-08. Coleman requested a hold on one of his net new accounts but Huff, with Stuart's "full support," denied the request. Id. at 152. Oracle assigned the account to a Caucasian employee hired in fiscal year 2008. Id. at 153.

On September 2, 2008, Huff, at Stuart's direction, placed Coleman on a PIP. See Coleman Dep. 102-03. The PIP stated "[f]or three of the last five years you failed to make your quota assignment, '04 was 18%, '05 was 149%, '06 was 49%, '07 was 63% and last year '08 was 118%. Achieving your quota only 40% of the time is not acceptable." Morgan Aff. Ex. 38. The PIP further stated that, by November 30, 2008, Coleman should (1) close 40% of his annual quota; (2) build a pipeline[5] equal to three times the balance of his quota; and (3) average six customer appointments per week. See id. The PIP also stated: "We will conduct a weekly meeting to review your progress against the improvement targets below." Id. The PIP did not include termination language.

On September 11, 2008, Coleman wrote a letter to Huff regarding the PIP. Id. Ex. 36. Coleman noted that, contrary to the statement in the PIP, he had exceeded his sales quota in fiscal

---

[5] "Pipeline" refers to the amount of business that an ASM is working on.

6

years 2004, 2005 and 2008.[6]   Id.   Coleman further noted that,
therefore, in the past five years he had attained his quota 60% of
the time, and inquired whether the corrected data changed Huff's
opinion that Coleman's performance was unacceptable.   Id.   Coleman
questioned whether the new sales patch was taken into consideration
when the PIP's quota goal was set.   Id.   Coleman was concerned that
the PIP's goals were unrealistic or impossible to attain.   Coleman
Dep. 105-07.   Huff did not respond to Coleman's inquiries.   Id. at
113-14.   According to Coleman, Huff cancelled meetings scheduled
with Coleman to discuss the PIP.   Id. at 117-18.   No one at Oracle
met with Coleman on a weekly basis to review Coleman's progress.[7]
Coleman Decl. ¶ 3.

On October 22, 2008, Huff emailed Human Resources Consultant
Colleen Madigan and stated that Huff and Stuart wished "to move
forward with formal termination at the end of the quarter if
possible."   Morgan Aff. Ex. 54.   On October 24, 2008, Huff again
emailed Madigan and wrote "[Coleman] will not meet his criteria.
Ted [Stuart] and I would like to proceed with a plan to review
adding formal termination language, can you help us escalate this
process?"   Id. Ex. 55.

---

[6] Oracle agrees that the PIP's statement is inaccurate and
that Coleman instead failed to meet his quota in two of the last
five years.

[7] According to Oracle, Huff and Stuart repeatedly followed up
with Coleman by email and in person regarding Coleman's progress
toward meeting the fiscal year 2009 PIP criteria.

Coleman did not meet 40% of his sales quota by November 30. See Coleman Dep. 111. On December 5, 2008, Stuart emailed Madigan and stated "I cannot afford to have [Coleman] remain in his current role for another month. I am having to play rep at one of his large accounts because he is screwing things up on a daily basis. We need to let him go now. Let me know what I need to do escalate this." Morgan Aff. Ex. 61. On December 29, 2008, Huff sent Stuart an "Involuntary Termination Recommendation" for Coleman. Oracle terminated Coleman on January 5, 2009. Compl. ¶ 38.

According to Coleman, he was treated differently than other ASMs. First, he was the only ASM placed on a PIP in fiscal year 2009 after attaining quota in fiscal year 2008. See Stuart Dep. 30. Second, Coleman was the only ASM placed on a PIP in fiscal year 2009 after being invited to Club in fiscal year 2008. Compare Morgan Aff. Ex. 28 with id. Exs. 41 and 27. Third, although five ASMs in Stuart's area, including Coleman, received an overall rating at or below 2 on the fiscal year 2008 appraisal review, only Coleman was placed on a PIP in fiscal year 2009.[8] See id. Exs. 27, 41-46. Unlike Coleman, the other ASMs did not make quota in fiscal year 2008. See id. Ex. 47. Fourth, although the majority of the ASMs in Stuart's group who were assigned sales quotas in 2008 did

---

[8] Coleman alleges that in fiscal year 2008, six ASMs received a 2 or lower on their appraisal reviews. See Pl.'s Mem. Opp'n 18 n.26. The court, however, can find no exhibit supporting the appraisal review score received by ASM Jim White.

not attain their sales quota, only Coleman, who did meet his quota, was placed on a PIP in fiscal year 2009.  Id. Exs. 27, 47-51. Lastly, by the end of the first quarter of fiscal year 2009, Coleman achieved a higher percentage of his quota than most ASMs in Stuart's group.  Id. Ex. 52.

On December 7, 2009, Coleman sued Oracle alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), the Minnesota Human Rights Act (MHRA), and 42 U.S.C. § 1981; breach of contract; unjust enrichment; and promissory estoppel.[9]  Oracle moves to exclude expert testimony and for summary judgment.  The court now considers the motions.

## DISCUSSION

### I.   Expert Testimony

Coleman seeks to introduce Dr. Robert A. Bardwell's expert report and supplemental report "on the Impact of Race on Employment of Application Sales Representatives[10] at Oracle, USA, Inc. June 1,

---

[9]  In his memorandum in opposition to the instant motion, Coleman voluntarily dismissed the breach of contract, unjust enrichment and promissory estoppel claims.  See Pl.'s Mem. Opp'n 25 n.32.  Coleman did not inform Oracle of his intent to dismiss these claims prior to filing his brief, causing Oracle to needlessly invest time and resources in seeking summary judgment as to those claims.  Pursuant to Rule 41(a)(2), the court dismisses these claims with prejudice and awards Oracle reasonable costs and fees associated with defending those claims.  See Fed. R. Civ. P. 41(a)(2).

[10]  "Application Sales Representative" is synonymous with (continued...)

2007 to May 31, 2009." See Morgan Aff. Exs. 4, 10.  In preparing the report, Bardwell reviewed Coleman's complaint, four of Oracle's answers to interrogatories and two reports from the Equal Employment Opportunity Commission (EEOC).  See id. Ex. 4, at 9. The report compares the "under utilization" of African-American and minority ASMs employed at Oracle nationally with the total number of African-Americans and minorities employed as "software sales workers" (as reported by the EEOC) throughout the entire United States.  See id. at 8.  Bardwell does not know how the EEOC figures were compiled or obtained, and therefore cannot attest to their completeness or accuracy.  The report does not define "utilization" and whether this term includes hiring, promotion, termination or other employment practices.  The report concludes that "[t]he statistical significance of racial disparity in utilization rates at Oracle supports a finding that African-Americans and minorities were not receiving equal opportunities at Oracle."  Id.

The supplemental report is based on additional employment data.  Id. Ex. 10, at 3.  In preparing the supplemental report, Bardwell considered Oracle Employment Information (EEO-1) reports from 2005-09, the rebuttal report of Anthony Hayter, and the materials considered in preparing the initial report.  Id. at 11. The supplemental report compares the "under utilization" of

---

[10] (...continued)
"Application Sales Manager."

African-American salespeople at Oracle with African-American "software salespeople" throughout the United States and finds that African-American salespeople at Oracle are under-utilized. <u>Id.</u> at 4-5. It also compares the involuntary termination of African-American ASMs at Oracle with non-African-American ASMs at Oracle, and found that the termination rate is higher for African-American ASMs. <u>Id.</u> at 5-6. The supplemental report further finds that "comparisons among Minnesota-only data are weak." <u>Id.</u> at 8.

Rule 702 of the Federal Rules of Evidence allows expert testimony only when it is relevant and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. The court acts as a gatekeeper to determine "whether the witness is qualified to offer expert testimony." <u>Schmidt v. City of Bella Villa</u>, 557 F.3d 564, 570 (8th Cir. 2009) (citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 589 (1993)). An expert must possess the "knowledge, skill, experience, training or education sufficient to assist the trier of fact." <u>Robinson v. GEICO Gen. Ins. Co.</u>, 447 F.3d 1096, 1100 (8th Cir. 2006) (citation and internal quotation marks omitted). This standard is satisfied when the expert's testimony "advances the trier of fact's understanding to any degree." <u>Id.</u> In short, the court must ensure that expert testimony "is not only relevant, but

reliable." Schmidt, 557 F.3d at 570 (citing Daubert, 509 U.S. at 589).  The proponent of the expert testimony bears the burden of proving its admissibility by a preponderance of the evidence.  See Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).

### A.   Timeliness

As an initial matter, Bardwell's supplemental report is untimely.  The district court has broad discretion to establish and enforce deadlines for compliance with discovery and pretrial orders.  See Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758-59 (8th Cir. 2006).  Here, the pretrial scheduling order dictates that Coleman's expert report must be prepared and disclosed on or before October 29, 2010.  See ECF No. 9.  Bardwell's supplemental report is dated December 17, 2010.  See Morgan Aff. Ex. 10.  The scheduling order does not contemplate supplemental or rebuttal reports.  Therefore, exclusion of the supplemental report is warranted on this basis alone.

### B.   Relevance

Rule 702 requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  "This condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  Daubert, 509 U.S. at 591 (citation and internal quotation marks omitted). Background evidence of an employer's discriminatory policies or

practices "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988), overruled in part on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). However, "[c]ompanywide statistics are usually not helpful in establishing pretext in an employment discrimination case, because those who make employment decisions vary across divisions." Sallis v. Univ. of Minn., 408 F.3d 470, 478 (8th Cir. 2005) (quoting Carman v. McDonnell Douglas Corp., 114 F.3d 790, 792 (8th Cir. 1997)).

Oracle argues that Coleman has not met his burden to show that Bardwell's reports are relevant to this case. The court agrees. Unlike cases involving class actions, disparate-impact claims and pattern-and-practice claims, Coleman filed individual, disparate-treatment claims against Oracle. Coleman must show that his supervisors at Oracle treated him differently because of his race. The generalized statistics in Bardwell's reports are not relevant to Coleman's claim and are so attenuated as to preclude a reasonable inference of individual disparate treatment of Coleman. Moreover, Coleman fails to show how Bardwell's reports would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Bardwell's reports are more likely to confuse the jury, as Coleman does not claim that

he was "under utilized" at Oracle.  As a result, exclusion of the reports is warranted.[11]

## C.   Reliability

Even if Bardwell's reports were relevant, they are not reliable.  The court considers several nonexclusive factors when determining the reliability of an expert's opinion, including:

> (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the theory has been generally accepted; ... (5) whether the expertise was developed for litigation or naturally flowed from the expert's research; (6) whether the proposed expert ruled out other alternative explanations; and (7) whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

Lauzon, 270 F.3d at 686-87 (citations and quotations omitted).

Consideration of these factors weighs in favor of exclusion. First, there is no evidence that Bardwell ruled out alternative explanations or considered relevant, race-neutral variables in reaching his conclusions.  This failure renders his report speculative.  "Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis."  Concord Boat Corp. v. Brunswick Corp., 207

---

[11] Even if the reports were relevant, the court would exclude them under Federal Rule of Evidence 403 because their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Fed. R. Evid. 403.

F.3d 1039, 1057 (8th Cir. 2000) (quoting <u>Weisgram v. Marley Co.</u>, 528 U.S. 440, 442 (2000) (internal quotation marks omitted) (excluding expert opinion that "did not incorporate all aspects of the economic reality of the [relevant] market."). Bardwell's reports fail to consider relevant variables other than race, such as skill, education and experience. In fact, Bardwell admits that the data could support other findings, including that African-Americans and minorities applied to Oracle at lower rates. <u>See</u> Bardwell Dep. 53-54. In this case, failure to consider other variables undermines the reliability of the reports. <u>See</u> <u>Franklin v. Local 2 of the Sheet Metal Workers Int'l Ass'n</u>, 565 F.3d 508, 514, 517 (8th Cir. 2009).

Moreover, Bardwell relied on assumptions to make unsupported conclusions. For example, Bardwell calculated the number of ASMs employed at Oracle in fiscal years 2006 and 2007 without accounting for reduction in force or transfers. Bardwell Dep. 76, 78. Further, Coleman does not show that Bardwell's sample size of eight Minnesota ASMs is large enough to be statistically significant. <u>See</u> <u>Tyler v. Univ. of Ark. Bd. of Trs.</u>, 628 F.3d 980, 990 (8th Cir. 2011) (collecting cases).

In addition, Bardwell's report fails to connect the proposed testimony sufficiently with the facts of this case. It is not clear how Coleman, who was hired and promoted at Oracle, was "under utilized" or how Bardwell's general under-utilization analysis

relates to the facts of Coleman's claims.  Finally, Bardwell's report was developed for litigation and does not naturally flow from his research.  "An expert's finding that flows from research independent of litigation is less likely to be biased and the expert is limited to the degree to which he can tailor his testimony to serve a party's interests." Lauzon, 270 F.3d at 692 (citation and internal quotation marks omitted).  Therefore, Bardwell's reports are not sufficiently reliable for the purposes of Rule 702 and exclusion is also warranted on this basis.

## II.  Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255.  The nonmoving party, however, may not rest upon

16

mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23. "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." Torgerson v. City of Rochester, No. 09-1131, 2011 WL 2135636, at *8 (8th Cir. June 1, 2011) (en banc) (quoting Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1077 (8th Cir. 2010)).

**B.   Race Discrimination**

An employer may not discharge or otherwise discriminate against an employee because of his race. See 42 U.S.C. § 2000e-2(m) (Title VII); Id. § 1981; Minn. Stat. § 363A.08 subdiv 2. (MHRA).[12] In cases involving indirect evidence of discrimination, such as here, the court applies the McDonnell Douglas burden-shifting framework to discrimination claims. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-05 (1973). A plaintiff must

---

[12] The court applies the same analysis to claims under Title VII, § 1981 and the MHRA when, as here, the claims depend on identical facts and theories. See Torgerson v. City of Rochester, 605 F.3d 584, 594 (8th Cir. 2010) (Title VII and MHRA); Takele v. Mayo Clinic, 576 F.3d 834, 838 (8th Cir. 2009) (Title VII and § 1981).

first establish a prima facie case of discrimination. See Humphries v. Pulaski Cnty. Special Sch. Dist., 580 F.3d 688, 692 (8th Cir. 2009). The defendant then must articulate a legitimate, nondiscriminatory reason for its actions. See id. at 692-93. The burden then shifts back to the plaintiff to produce evidence demonstrating that the defendant's reason is pretext for unlawful discrimination. See id. at 693.

### 1.    Prima Facie Case

To establish a prima facie case of race discrimination, Coleman "must show that he (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) has facts that give rise to an inference of discrimination." Takele, 576 F.3d at 838 (citation omitted); see also Elam v. Regions Fin. Corp., 601 F.3d 873, 879 (8th Cir. 2010). The first and third elements are not in dispute.

Oracle first argues that Coleman cannot show that he was meeting Oracle's legitimate job expectations. This element, however, "merely requir[es] [Coleman] to show that [he] was qualified" to perform the job, not that he was performing the job satisfactorily. Arnold v. Nursing & Rehab. Ctr. at Good Shepherd, LLC, 471 F.3d 843, 846 (8th Cir. 2006). Coleman worked at Oracle for approximately 10 years, was an ASM from 2003 until his

18

termination, and demonstrated the basic skills needed to sell software.  Coleman met his burden to show that he was qualified for the ASM position, and, therefore, this element is satisfied.

Oracle next argues that Coleman fails to produce facts that give rise to an inference of discrimination.  Coleman met this burden "by producing facts that similarly situated employees, not in the protected class, were treated differently."  Wheeler v. Aventis Pharm., 360 F.3d 853, 857 (8th Cir. 2004); see also Takele, 576 F.3d at 839.  The court applies the low-threshold test to determine whether employees are similarly situated at the prima facie stage.[13] Coleman must show that he and other ASMs were "involved in or accused of the same or similar conduct and [were] disciplined in different ways."  Wheeler, 360 F.3d at 857 (citation omitted).  Coleman satisfies this burden.  No other ASM who exceeded his quota in fiscal year 2008 was placed on a PIP and terminated in fiscal year 2009.  Therefore, Coleman has met his prima facie burden.

### 2.   Legitimate, Nondiscriminatory Reason

Oracle offers legitimate, nondiscriminatory reasons for terminating Coleman.  Coleman was not meeting the expectations of

---

[13] The court recognizes that the standard at the prima facie stage is unsettled in the Eighth Circuit.  See Wimbley v. Cashion, 588 F.3d 959, 962 (8th Cir. 2009) (noting that one line of cases applies a "low threshold" standard while another applies a "rigorous" standard).  In the present case, the outcome is the same under either standard.

his position in the following areas: (1) "Lack of Performance-[Coleman] has attained his license quota in two of the past five fiscal years only..."; (2) "Insufficient Pipeline Generation - In FY 09, [Coleman] has fallen significantly short on his pipeline target .... [He] has generated unqualified opportunities at his current customers only .... He does not have any new customers in his pipeline"; (3) "Inability to Strategically Plan a Sales Cycle - The only real sales cycle [Coleman] has engaged in FY09 (DataCard) was unqualified and premature"; (4) "Inability to Generate Executive Level Discussion - [Coleman] could not get appointments with executives because he does not consistently create and deliver a compelling message"; and (5) the three objectives set forth in the September 2, 2008, PIP. Morgan Aff. Ex. 64. Further, Coleman failed to meet quota in fiscal years 2006 and 2007, used excessive sales consulting hours in fiscal year 2008, and failed to satisfy the expectations expressed in his annual performance reviews. Therefore, Oracle has met its burden to show a legitimate, nondiscriminatory reason for Coleman's termination.

### 3.   Pretext

Coleman first argues that Oracle's factually inaccurate explanation for his termination supports an inference of pretext. See Tyler v. Univ. of Ark. Bd. of Trs., 628 F.3d 980, 988 (8th Cir. 2011) ("A plaintiff may show pretext with evidence that the

employer's explanation is unworthy of credence because it has no basis in fact."). Coleman argues that each of Oracle's proffered reasons for termination has no basis in fact. Coleman (1) met his sales quota in three of the past five years, see Coleman Dep. 103-04; (2) generated a qualified opportunity with a new customer, see Stuart Dep. 215-17; and (3) generated executive-level discussion, see id. at 214-15.

Coleman also argues that he was treated differently than similarly-situated employees. At the pretext stage, Coleman must satisfy the rigorous standard for determining whether similarly situated employees were treated differently. See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005); Torgerson, 2011 WL 2135636, at *15. "To be similarly situated, the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir. 2004) (citation and internal quotation marks omitted). In short, the other employees must "be similarly situated in all relevant aspects." Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 864 (8th Cir. 2008).

Coleman argues that he is similarly situated to all ASMs working under Stuart. Oracle argues that Coleman is similarly situated only to the seven other ASMs directly reporting to Huff in fiscal years 2008 and 2009. The court disagrees. The record shows

that Stuart was a primary decision-maker in Coleman's employment from the second half of fiscal year 2007 until Coleman's termination. Stuart was involved in conducting Coleman's performance appraisals, assigning his sales patch, setting his sales quota, placing him on a PIP and recommending his termination. Oracle's argument that Huff was Coleman's only relevant supervisor is further undermined because Stuart "worked a lot more closely with [Coleman] as a result of [Huff's] illness." Stuart Dep. 16-17. Moreover, Stuart provided feedback to lower-performing ASMs under all three regional managers. See id. at 17. Because performance appraisal is "an important step" which Oracle "take[s] seriously," Stuart "collaborate[s] broadly with" his regional managers in appraising low-rated ASMs. Id. at 18. The record shows that Stuart had supervisory responsibility over all ASMs in his area. The court determines, therefore, that Stuart is a relevant supervisor for all ASMs working under him.

To be similarly situated, however, Coleman must also demonstrate that other ASMs under Stuart engaged in the same conduct without any mitigating or distinguishing circumstances. See Tolen, 377 F.3d at 882. Coleman argues that he was treated differently than Caucasian ASMs in several ways, including that he was the only ASM placed on a PIP in fiscal year 2009 after

22

attaining quota and going to Club in fiscal year 2008, and he was the only ASM invited to Club in fiscal year 2008 to receive a low fiscal year 2008 review.

Oracle responds that Coleman failed to identify other ASMs who engaged in the same conduct without any mitigating or distinguishing circumstances because only Coleman missed quota in fiscal year 2006, was placed on a PEP in fiscal year 2006 and failed to satisfy its requirements, received a "2" on his fiscal year 2006 performance appraisal, missed quota in fiscal year 2007, used excessive resources in reaching quota in fiscal year 2008, and received a "2" on his fiscal year 2008 performance appraisal.

Coleman admits that he performed poorly in fiscal years 2006 and 2007, and that Oracle could have justifiably terminated him during those years. See Coleman Dep. 108. His claim for discrimination, however, arises from disparate treatment associated with Stuart's heightened supervisory role, which began in the second half of fiscal year 2007. Viewed cumulatively and in the light most favorable to Coleman, the facts are sufficient to generate a triable question regarding pretext and discriminatory animus. See Willnerd v. First Nat'l Neb., Inc., 558 F.3d 770, 779 (8th Cir. 2009). When a plaintiff meets his burden to produce evidence supporting a possible inference that the employer's proffered reasons are pretext for unlawful discrimination, the court may not grant summary judgment, even when it appears unlikely

that the plaintiff will meet his ultimate burden to show that his termination was the result of discriminatory animus. See Hossaini v. W. Mo. Med. Ctr., 97 F.3d 1085, 1088 (8th Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). Therefore, summary judgment is not warranted on Coleman's discrimination claims.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1.    The motion to exclude the expert testimony of Robert A. Bardwell [ECF No. 61] is granted; and

2.    The motion for summary judgment [ECF No. 58] is denied as to plaintiff's race discrimination claims (Counts I, II and III); and

3.    The motion for summary judgment [ECF No. 58] is granted as to plaintiff's breach of contract, quantum meruit/unjust enrichment, and promissory estoppel claims (Counts IV, V and VI). These claims are dismissed with prejudice and defendant is awarded reasonable costs and fees associated with defending these claims. Defendant shall submit proper documentation of its reasonable costs and fees incurred to defend these claims.

Dated:  July 14, 2011

s/David S. Doty
David S. Doty, Judge
United States District Court

24